Our first case of the afternoon is People of the State of Illinois v. Charles Silagy. Is that the right pronunciation, Mr. Shiloh? This is number 410-0550. You may proceed. May it please the court, Ms. Brooks. My name is Charles Shiloh. I was formerly employed by the Office of the State Appellate Defender at the time this appeal was assigned to that office. As your honors can tell from the caption of this case, the proceedings here began in 1980. And despite the fact that 30 years have passed and several judges have been involved with the case, several sets of attorneys, several hearings have been held, it is my contention that Mr. Silagy is still entitled to a day in court that he has not been afforded up to this point. And to present that argument, we need to go back to the pretrial proceedings in 1980. Mr. Silagy was charged with the murder of two women, one of whom was his girlfriend and the other was her friend and roommate. And the defense gave notice it was going to present the defense of insanity. At that time, the state retained Dr. Traugott from the Carl Clinic to examine Mr. Silagy for an evaluation of that defense. And Dr. Traugott made a finding that Mr. Silagy, as distinct from people with physical, organic mental disorders, was an antisocial personality, which is not a disease or defect. That's what was tendered to the judge, that's what was tendered to the defense. The trial proceeded, the defense presented an expert who said that basically based on childhood trauma and so forth, that Mr. Silagy could not conform his behavior to the law at the time of these homicides. It's important to note that the issues here should be reviewed under the standard of insanity that was in effect in 1980, as opposed to today where there must be a showing that the defendant can't appreciate the criminality of his conduct. At any rate, that was the defense expert testimony. Dr. Zaboran, if I remember correctly. Yes, indeed. And Dr. Zaboran had previously treated Mr. Silagy when he was an inmate and basically presented a defense, a theory based on trauma from his childhood, things that his mother had done or had not done. Trauma that would have affected his personality or trauma that also caused some of the same problems? Well, that was the theory, that because of the childhood trauma and so forth, he was unable to conform his behavior to the law, especially in regards to relations with women. So the jury came back with a verdict of guilty. Mr. Silagy then chose to represent himself in the death penalty proceedings. And he was actually quite, I would even say eloquent in his request to the jury that he'd be sentenced to death, which the jury in fact did. There was a direct appeal, which was unsuccessful. There was a post-conviction filed, an initial post-conviction filed. This, I have to note, this is an appeal from the denial of a second petition for post-conviction relief. Stage two denial? Well, that's hard to say, Your Honor. I would say that it was because when I, if I ever get through the procedural history, when I get to the merits. Well, we're familiar with the procedural history. All right. But I think it's relevant to how these issues arose and why this case, to my mind, is still unresolved. So the bottom line is Dr. Traugott didn't say your client had organic brain damage when he testified as a state's witness that your client was not insane in his 1980 murder trial. That's correct. And he also did not disclose that finding to the judge or to the defense, obviously. And the problem arose then later on when he subsequently, at a post-conviction hearing, is shown MRI evidence of your client's brain scan. Is that right? And there's some evidence of organic brain damage, and he's asked about that at the later hearing, and he says, well, sure. He's an alcoholic. All alcoholics have organic brain damage. Doesn't everyone know that? That's a very accurate recitation of the facts, Your Honor. I appreciate you probably sped up this process. And had he testified, yeah, he had organic brain damage, but that doesn't matter, in 1980, he'd have no case. Well, that's where I differ. Okay. Tell us about it. The reason for my disagreement on that point is based on the cross-examination that the defense lawyers in when there were hearings on the second post-conviction in 1998 and 99, and Dr. Traugott, after witnesses testified about the organic brain damage, which was based on the MRIs, which were not available in 1980, I think is an important point. The state then called Dr. Traugott at this post-conviction hearing, and basically he said, well, you know, I didn't report that because it wouldn't have had any effect on his behavior. Well, in the next set of, and Ms. Brooks quotes that exchange, but if you look at the next hearing that was held, there's a very effective cross-examination of Dr. Traugott by counsel for Mr. Szilagyi, and obviously I'm reading it with a biased eye, an advocate's eye, but Dr. Traugott has a very difficult time, it seems to me, explaining how it could be that given the protocols for evaluating people's mental states, given the DSM-3 or 4 or whatever version they had at the time, how one can reconcile a finding of organic brain damage with an ultimate diagnosis of, well, this is just antisocial personality. Well, the first question is, Dr. Traugott's opinion is based upon his opinion that everyone who's an alcoholic like Mr. Szilagyi has organic brain damage. Isn't that correct? Well, he said in answer to a direct question, did you find organic brain damage? And he says, yes, yes, that's correct. So it isn't just his theorizing, saying I examined the person, that's what I found. Well, we're talking about what he said, and his view is everyone who's an alcoholic has organic brain damage. Isn't that correct? Well, that may be. That may be his view. Well, isn't that pretty important, Mr. Sheetal? I mean, for instance, if that's true, that that's his opinion, then what did he withhold? And is that your claim, by the way, that this was a Brady violation and a proper misrepresentation of evidence by a state's witness so as to deprive your client of a constitutional right? The claim that was made in the post-conviction when the doctor revealed for the first time his finding of organic brain damage was that this certainly would have been of use to the defendant at trial. So Dr. Traugott was never asked at trial did he have organic brain damage, was he? No. And he omitted that from his report to the court and did not testify to it. And he wasn't cross-examined on that? No, he was not. Nor did the defense expert testify to that, even though I assume the defense expert knew that the person examined had a history of alcoholism. That's true. But they did not have the advantage of these brain scans. Well, you say did not have the advantage. Is that because MRIs didn't exist in 1980 because they weren't taken? Well, Dr. Traugott testified that they were not available in central Illinois back in 1980. But the point about whatever the basis for the doctor's belief as to why he didn't need to tell anyone about this, the defense in the post-conviction proceedings walks him through the protocol for the DSM and basically confront him with this scheme that they have, which I don't completely understand. But there's something called a decision tree when one is evaluating someone's mental state as to fitness or insanity or whatever the case may be, and that the very first thing that is supposed to be considered is whether there is an organic, there's a physical defect of the brain. And if that finding is made, the decision tree doesn't lead to the branch of antisocial personality. And in the subsequent, and Dr. Traugott basically says, well, you know, I don't really agree with that. Well, if that's true. Which is fine, but it's a question of, it goes to his credibility. Well, wait a second. If that's true, then what did he withhold? He withheld his finding that there was organic brain damage. Did he answer all these questions at the post-conviction hearing? Yes. Why wasn't he questioned about that at trial? And if he had been, what would he have said then? Well, I assume that he would have, had he been asked that he would have responded, I don't know. But my view is he had an obligation to disclose that when he made the finding in the pretrial examination. And his basic testimony at the post-conviction proceedings was, well, it didn't affect his behavior. That's why I didn't have to disclose it. Was he still of that view in 1988? Yes, I would say that he was. Or 98. I would say that he was. So this would be a basis to impeach his testimony. Exactly. And that reaches this constitutional level because of how he interpreted the information he had before him? Yes, because he did not follow the DSM protocol. Was that in existence when he testified in 1980? I'm sure there was a DSM. Is there evidence to that effect that this decisional tree you just argued to us was in existence in 1980? I'm not sure about that, Your Honor. Isn't that pretty critical to the argument you're making? That might have been a DSM, too. We're now at four and, I think, almost ready to be five. Right. I mean, regardless of what was in the decision tree in 1980, and I don't know that they went into that, but the defense presented experts in the following hearing who talked about the fact that you can't go from a finding of organic damage to the branch that leads you to antisocial personality. And I think that this would have been something that is. Dr. Jarget doesn't agree yet. Well, okay. Apparently, does he? But whether he does or not, the fact is. The defense would be using this as a means to argue he shouldn't be as credible as he would have before him. Well, exactly. And the defense. No, I still disagree. Hey, you know, to say that an alcoholic has organic brain damage, all alcoholics have organic brain damage, it doesn't answer the question of whether or not they're insane under the definition of Illinois law. Well, no, it doesn't answer the question. But the defense point in raising this issue was that had this been known to the defense at the time, they would have pursued a different path. They would have pursued a path of concentrating on this organic damage as opposed to trying to show that, you know, he's a traumatized person. Tell me what the cross-examination would have been if Dr. Jarget had the defense counsel in 1980 at the murder trial said, do you believe that all alcoholics suffer from organic brain damage like my client? He says, yeah, sure. Now, where are you going with that? I think he would have gone to the same approach that the post-conviction attorneys did, which would be to say that. You told us in your report to the judge, you say, this guy's different from people who have organic damage. Now you're saying he does have organic damage. Well, that puts him in a different position. And it would have been very essential to the defense to have had this in terms of impeaching Dr. Jarget and in terms of presenting a defense that is much more sympathetic, is much more acceptable to a jury. Because Professor Easterbrook describes that as being more important. Well, he's not the only jurist. Well, he's the only one you cite. Well, that's true. But the doctors who testified as experts in the post-conviction proceeding all agreed that Dr. Jarget's analysis was flawed and that there's a big difference between people who have an organic problem and people who have an emotional problem. That there's a big difference between assessing someone with a damaged brain and someone with, as Your Honor has sometimes characterized it, the disease of being a bad person. Mr. Sheagle, can I ask you a couple questions? One is, is your client still insane today? Your Honor, it's difficult for me to respond to that. I know that the clerk of the court at least has received a lot of correspondence from him. The office has received a lot of correspondence from him, some of which is lucid, some of which is not. It's difficult for me to speak to that. I noted that in your argument you stated that he was eloquent in his closing argument at the death penalty case. Yes, indeed. But the issue is his state of mind at the time of the offenses. Right, but organic brain damage never goes away, does it? Well, according to the expert testimony, from looking at the MRIs, they were saying that possibly his brain is in better shape now than it was in 1980 because they're assuming he hasn't been exposed to large amounts of alcohol being in the Department of Corrections during all this time. I guess what I'm getting at, though, is if you suffer organic brain damage, does the brain self-repair after that? Well, there's testimony about that in the record on that point, which it can to a certain extent. But basically the point that they made was looking at the severity of the shrinkage from the scans done in the 1990s, they said he was probably worse in 1980. But there's no physical evidence like an MRI from 1980. No, and as I say, the testimony was that they were not available at that time in central Illinois. So was Traugott just surmising he suffered from organic brain damage? It was a lot of what Justice Steigman is saying in terms of alcoholism. But the standard here in terms of whether he's entitled to an evidentiary hearing is that there could have been some effect on the jury if this had been known at the time of trial. No, that's not the standard, counsel. The relevant question raised during a second-stage post-conviction hearing is whether the allegations in the petition, supported by the trial record and accompanying affidavits, demonstrate a substantial showing of constitutional deprivation. Well, I think this is a substantial showing. A substantial showing requiring us, which you're arguing, to set aside a murder trial from 31 years ago where your client viciously killed these two people and grounds these defenses I was insane, is that Dr. Traugott could have been impeached more effectively had trial counsel in 1980 asked different questions and had we now had available material from 1998. Well, it's... That's it, isn't it? The prosecutor didn't do anything wrong. Well, the doctor is an agent of the prosecution. But what I was going to say was that the relief that is being sought here is an evidentiary hearing and doesn't have to show that he would have been acquitted. He has to show there might have been some effect on a jury... He has to show a substantial deprivation of constitutional rights to get to third stage for us to say the trial court was wrong. Yes, and I believe he's made a substantial showing that there could have been an effect on the outcome of the trial. To impeach Dr. Traugott. And to open the door to experts presenting the defense based on brain damage as opposed to childhood trauma. One problem with this is that you've got a 1908 trial, a 1991 MRI, a 1998 evidentiary hearing, and a 2011 appeal. First of all, we don't know what that pyramid was or what that tree was. We don't know if that was the same. And the defendant was represented by counsel and had an expert witness. And the expert witness was an expert witness who gave a psychiatric or medical opinion. And that person would have some knowledge of the effect of alcoholism on a criminal defendant, I would assume. Well, he did testify that he thought alcohol contributed to Mr. Szilagyi's actions on the night in question. He did not speak to a condition other than the trauma from the psychiatric perspective. And one of the experts who testified in the post-conviction proceedings actually coupled them. So his alcoholism and his mental state and his abuse or traumatic events as a child were all at issue. They were known. Yes. By everybody who's participated in the case. The alcohol abuse, yes, and the childhood trauma, yes. What wasn't known was that, in fact, there was an organic component to his mental makeup at that time. And that, I would submit, presented to a jury, there's certainly a reasonable probability it would have had an effect on the outcome. And that's the standard, I believe, that has to be met here. And an evidentiary hearing, I mean, one of the unfortunate things about the case is that the opportunity to present the evidentiary, to present further evidence on this point was subsumed in the commutation of his death sentence. And at that time, the lawyers who had been representing him from a large firm, Pro Bono and so forth, basically, I think, had forgotten about this claim they had raised regarding the fairness of the trial itself because their basic thrust was that trying to convince the court Mr. Szilagyi was no longer fit. So for years, he didn't have the benefit of an attorney who recognized that he still had issues out there. And all along, he has been seeking to get back into court and has been consistently rejected on the grounds that everything has been decided already. And I think the way that this court should be viewing the ruling by the trial court is not that the trial court reached the merits, it did the sort of analysis your honors are doing now, but believe that the issue was moved. Because the only thing he said in regard to ruling on the question was, I'm granting the motion to allow the claim, there are two claims, but I'm denying them. And then he goes on to say the defendant's death sentence has been commuted. Well, that's a non sequitur in the context of a claim that went to the trial, not just the sentencing hearing. And as a matter of state law, the sentencing issues are moved. But a challenge to the underlying conviction is not. And he's entitled under the Post-Conviction Hearing Act to a court that understands that and is going to make this evaluation. This is not something that this court should be deciding for the first time based on a cold record. Thank you. Thank you. Your time has expired. I don't want to distract you from your rebuttal, but I would also like to know if leave was granted to file the second amended post-conviction hearing. I'll certainly speak to that. May I please the court and counsel? My name is Anastasia Brooks. I was a graduate of U of I Law School in 99. And I'm here on behalf of the appellate prosecutor's office as well as the people of the state of Illinois. First of all, briefly, I would like to touch on the jurisdictional issue because I believe my brief had urged that there was no jurisdiction. Subsequently, to that brief being filed, the defense had filed a late notice of appeal, which according to my calculations was timely within the six-month safety valve of Rule 606. So, therefore, the state does concede that there is, in fact, jurisdiction. However, of course, I note, as a small technical matter, we are here under case number 4-10-0550, which was docketed on the basis of a prior notice of appeal for which there was no jurisdiction. If this court's usual practice is to docket a late notice of appeal under a new number, the state would have no objection to redocketing the briefs in this case and considering also this oral argument under a new number if that were required. So with those remarks in mind, I'd like to proceed more to the merits of the issues, particularly as to the defendant's reply brief arguments. It seems like there is some question as to the procedural nature of what happened in the circuit court because part of the defendant's arguments appear to treat this as a first-stage dismissal under the Post-Conviction Hearing Act and claiming that the state is not entitled to argue, according to the defense, that the defendant's petition failed to make a substantial showing of a constitutional violation, which is what would be necessary for him to obtain a third-stage evidentiary hearing, which is, according to the defendant's argument here, that is the relief he is seeking from this court. So in order to get a remand for an evidentiary hearing, he would have to, in fact, make the substantial showing of a constitutional violation, and, in fact, in the defendant's opening brief, that is exactly what he claimed that he has done. So, therefore, the state is, in fact, entitled to respond to the claim that his petition made a substantial showing, and even if the trial court ruling had denied or dismissed his petition solely on the basis of I'm referring now only to Claims 29 and 30. The first 28 were previously dismissed or denied. 28 was denied after an evidentiary hearing, 1 to 27 without an evidentiary hearing. But as to Claims 29 and 30, which are at issue in the defendant's brief now, when the trial court rules that those issues are moot because of the commutation of his death sentence to natural life without parole by the governor, that that makes those issues moot. Now, the state would recognize that I believe it was Claim 30. That goes as to the conviction. That is not moot, and that is the case of Peeble v. Mata. Recognize that. However, this court can affirm the trial court's judgment on any grounds supported by the record, which here is a defendant's failure of his petition to make a substantial showing that the Brady claim that he is raising is a meritorious issue. That would be the defendant's burden. He's failed to do that, not only showing that something was withheld from him in violation of the rule of Brady, but what seems to be glossed over and not what perhaps is the more important issue as well is the necessity of the defendant to show that any withholding of information in violation of Brady had been material. And the materiality showing is something that he is not emphasizing here. It's something that really has to be considered because it perhaps is the most important part of the issue and a burden that he has to meet in order to get relief. So I have two questions. First is we are at the second stage. Then it's your position this was the second stage post-conviction proceeding dismissal? I think that the answer is yes, but I'd like to clarify that a little bit. Okay. It's a second petition. The first one had been denied and affirmed or dismissed and affirmed a long time ago, 1980s. The second petition was filed in 1990. Additional claims were added. And the first judge, I believe, it might have been 1999 or something, recognized they were, quote, on file. The defendant files in this court a motion to remand for further proceedings. This court enters an order directing the trial court to enter a final order. Essentially, I don't know that there has been a specific state motion to dismiss filed in the circuit court claiming that 29 and 30 should be dismissed for whatever reason, which the most obvious one would be the failure to state a substantial showing of constitutional violation. Well, how could it be a first-stage dismissal when it's certainly beyond 90 days? And it seems to me anything beyond that by definition can't be first stage. Well, that's the state's position is once the, I'm not sure what the statute would have required in 1990, but I believe because he wasn't, his death sentence was not commuted until 2003 by Governor Ryan. When he had filed his second post-conviction petition, I believe it was 1990, there was no first-stage review because even though I believe there had been a statute in effect, it did not apply to death penalty cases. So this was never a first-stage review case because he had a pending death sentence. So the claim that somehow, because it had reached the second stage, the first stage of death penalty cases basically, there had been an appointed attorney for him. And he's adding new claims. Essentially the only claim he could make is that there somehow is a missing motion by the state to dismiss. But he still had his day in court, so to speak, because I guess if he's trying to say is because we never filed a motion to dismiss, he didn't have then a chance to respond at a hearing on that motion. But what he asked this court for is a remand. And if he was dissatisfied with the nature of this court's remand order, which directed the trial court to enter a final order, then he should have perhaps complained to this court and requested this court to issue a different order, for example, directing some other form of relief. And it might be a practical situation where it seemed like this court ordering the trial court to enter a final order. I'm not sure if that had the practical effect of telling the judge to essentially dismiss the petition because if the final order had to be returned within a set period of time, that's what the order said, the only final order that practically could have been issued within that time frame would have been an order of dismissal. So the trial court would have had to either seek an extension of time to file a final order if there had been a necessity of noticing motions to dismiss or possibly even holding an evidentiary hearing on his petition. So if he was dissatisfied with the way that went, he should have complained to this court and obtained a different order of summary remand. On the merits, you argued that the claims Mr. Cheadle is making on behalf of his client don't address material issues in this case. You heard his explanation that this information might have and still would have affected the ability of the defendant to cross-examine Dr. Traugott on his findings and he was the state's witness on how the defendant was not insane. Why aren't those matters material? Well, what I read from his brief is almost the assumption that because the defense was insanity that this becomes automatically material. I didn't see a discussion of the facts of the case, for example, or more importantly, showing that this petition has somehow contained an affidavit, for example, from an expert witness that he might have obtained to show that this was in fact material. In other words, that if the defense could have obtained an expert, attached it to the position, an expert who, if he could have found one who may have opined, that if the defendant had organic brain damage caused by extensive alcohol abuse over his lifetime, that that might have deprived him of substantial capacity to conform his behavior to the requirements of the law, the standard for insanity that he was alleging. This is a Brady case, and the argument is that the state, through its agent, Dr. Traugott, who is the state's witness, intentionally withheld evidence so as to deprive the defendant of his constitutional rights when it might have been exculpatory in some fashion. I'm wondering, clearly this is a different sort of situation than the typical argument. This is a case where we have an expert witness who was not, it seems to me, as perhaps forthcoming as opposed to withholding something, he had his opinions, and I don't know that he changed any from earlier and wasn't cross-examined about it. In your research, have you found anything on the question of expert witnesses in a Brady context as to the completeness or fullness of the rendered opinion as opposed to a situation where some third party confessed to the crime and a cop withheld that? Are there other more typical or clear examples of withholding evidence? Well, Your Honor, I haven't found specific cases close to this issue, but what the claim here the defendant makes is that there had been a finding of organic brain damage in 1980 by Dr. Traugott. Essentially what he actually said was, Dr. Traugott said, and I assumed, based on his history of alcoholism, that he would have had organic brain damage. That was all that was known in 1980, and that also appears to be something that went on in Dr. Traugott's own mind. And there's no showing by the defense that anything that was merely a thought or conception inside a psychiatrist's own head, his own mind, was something that was possessed by the prosecution, and therefore the prosecution had a duty to tender that. In other words, Brady refers to things that are withheld. And when you get down to what is the essential fact that the defense relies on here that was never disclosed, according to the defense, of what the prosecution should have disclosed, is that people who are alcoholics have organic brain damage. A fact that would have been widely known in 1980, which was common knowledge, and therefore is not something that is subject to Brady, because the defense had access to its own experts, had ability to test the defendant's own brain, for example. And in the situation... I take it the record of Dr. Zaborin's testimony from 1980 reveals no testimony about the subject? He wasn't asked? He was the defense shrink. In 1980? Yes. Okay, I'm trying to remember if that was Zaborin. No, Dr. Zaborin's a well- Mr. Shiro and I recall. Well, he's kind of famous. He testified in several dozen cases, and he never met a sane criminal defendant. Ever. It's a name that sticks with one. Well, essentially, I guess my argument is, the defense argument says that if this had been known, which is common knowledge, which wasn't really withheld, which the defense of their own reasonable diligence should have known, alcoholics have brain damage, he assumes that he would have obtained an expert then that would have focused the insanity defense on the nature of the defendant's brain, having loss of matter, for example, if that even could have been determined, because in 1980 there were no MRIs. So there was no, or at least available to the defendant in this case. So assuming that the defense, the defendant assumes that he would have then staked his defense on, well, he lacked substantial capacity, the argument would go, because he had the brain damage from alcoholism or possibly contributing as well from head injuries as a child. So because the connection between alcoholism and brain damage is widely known, it's not subject to grading, it's not an error, and even if it were, it's not been shown to be material. There's no expert opinion that the defense petition has that would go to establishing that, as well as the facts, especially some of these were cited by the Supreme Court of Illinois when reviewing the defendant's conviction and sentence in this case. Some of those facts included the ability of the defendant, facts that established the ability, defendant's ability to restrain himself in the situations prior to and after the murders of both Cheryl and Ann. And one of the facts was identified was his making out in the car, that he was choking her, a car is coming along after they had spun off on the side of the road, and he stops choking her, acts like he makes out, the car passes, then he resumes choking her before he knocks her out of the car and stabs her to death. And then also when Ann and DeVoe, who had returned to the trailer, this was a few hours later, he doesn't kill Ann right away, he waits until DeVoe leaves, and then right after DeVoe leaves, then they get in another altercation, and again, stabbing in the heart. The same way he did it to Cheryl, and he had reasons for picking the knife, he had reasons for choosing where to stab these two women. It shows a knife that wouldn't bend, as I recall. Yes, Your Honor, and the fact is this shows that he was having an altercation at the bar, the one with the strip club next to it. He's nice to the manager, he reconciles a little bit with Cheryl, and it seems like there's not a showing that, because I think there's records that he was drinking for several hours. I don't believe the records showed that he had all that much alcohol. There had been a pitcher ordered. He didn't really have that much to drink, and even DeVoe didn't think that he was intoxicated. So in context, you don't view this as a substantial deprivation of a constitutional right? Particularly because nothing was withheld, and anything that the defense claims had been withheld and should have been disclosed was not material. Withheld is a term of art, it seems to me, in an assessment of a Brady violation. That's why I go back to the question I asked, perhaps I didn't ask it well, whether it can really be something withheld where a state's expert witness answers the question and I suppose the best can be said of the defense argument is, well, he really had more stuff to say, but he didn't add that, and that might have been helpful to us. Well, the closest case I found was that I believe it was a police officer who went on a TV camera after the trial, and that was not withheld because it was a view expressed after the trial, and this is essentially a view that wasn't, the record doesn't show it was ever shared with the prosecutors, and it was something that comes out after the trial's over. It's nothing that should have been or could have been disclosed to the defense by the prosecution, which is the burden is not on the state psychiatrist to disclose favorable information or evidence to the defense. It's the burden on the prosecution and agents of the prosecution. I'm not sure if this expert witness qualifies as an agent of the prosecution. He might have been somebody who was court appointed. I don't remember exactly if that was the case. He testified for the state, obviously, because he had made the opinion upon review the defense submits an insanity defense. Then he has to cooperate with examination by psychiatrists in order to be able to present that defense. And, of course, once the psychiatrist opines that he was, in fact, legally sane at the time of the murders, the state is going to want to present that in order to rebut the claim of insanity. So I'm not sure that that meant that he became an agent for the prosecution, even though he had been called as a witness for the prosecution. It's just very limited as to the commutation issues. Element courts recognize an executively imposed sentence replaces the death sentence. Therefore, the defendant loses the ability to challenge any errors in the judicial imposition of the death sentence once he obtains a commutation of sentence from the governor. If the defendant had wanted to be able to preserve his ability to assert errors in that death sentence being imposed, he should have then sought a limited pardon from the governor, a limited pardon only remitting the portion of punishment that is the death sentence rather than a commutation which replaces his sentence. So, therefore, the claim is, in fact, moot on Claim 29. So for these reasons, if this Court has no further questions, request this Court to affirm, and thank you for your time. Thank you, Counsel. Mr. Sheetal? Your Honor, I had a question about the second post-conviction petition. The defendant had basically exhausted his direct appeal, post-conviction appeal, and habeas avenues of relief by 1990 or 91. And at that point, his pro bono counsel had obtained a petition from the MRIs and so forth, and so they petitioned the Illinois Supreme Court for a stay of execution to allow them to litigate this new finding in a second post-conviction petition. And the state Supreme Court entered the stay, allowing the petition to go forward. I also should point out that this is a second petition which preceded the codification of the cause of conviction as a prejudice standard, preceded People v. Pitsenbarger, which set out that as the threshold for a second petition. So whether we can go behind what the Supreme Court decided to do, I think implicit in their order was the belief that this was something that couldn't have been presented earlier and that was material to issues being litigated. You've answered my question. Thank you. With regard to the procedural posture, I think that, as I noted earlier, the court's denial order and then talking about the commutation indicates that he erroneously believed that the issue was moved. And I think that under this court's decisions in cases like People v. Carter, talking about the confines of the post-conviction act, that that is the framework that should be followed. And Mr. Szilagyi is entitled to a judge who doesn't think that his claims are moved. And he's also in a position where he's been told that he can represent himself, but he's had judge after judge say, yeah, I'm going to let him represent himself, I'm going to let the lawyers withdraw, because there's nothing left here. There's nothing to be done. His sentence was commuted, ignoring his various efforts to get them to consider this claim that's not moved. And the same judge who made the order after Your Honor's remand had earlier been in a press hearing, he's asking, well, can I be heard on these claims because they're not moved? And the judge's response to that was to say, you know, without giving Mr. Szilagyi any chance to appear, even though he had said you can represent yourself, or he had told the lawyers that Mr. Szilagyi could represent himself, just says, this is a totally frivolous request, the request to be heard. Well, the only way a request to be heard on something can be frivolous is if the matter is in fact moved. But it wasn't moved. It's not moved. And Mr. Szilagyi is entitled to the protection of the Post-Conviction Act in terms of the structure of where claims are presented. Mr. Sheter, let me ask the same question I asked the State's counsel about withholding evidence as a term of art. The Brady claim is state improperly withheld exculpatory evidence depriving the defendant involved of his constitutional rights. I'm pretty familiar with Brady and its progeny, and I'm trying to recall any case quite like this. That is, on just the threshold issue, is this a withholding of evidence when you have the State's experts who apparently has, I think the worst can be said from the defense point of view about him, and I'm not inferring your claim that he lied. It's just a matter of his initial report wasn't as complete as you think it could have or should have been. Maybe that's true, but there he is, and there he's subject to cross-examination. It's a technical point. He wasn't asked how 30 years later can we view this as a withholding of evidence under Brady constituting a substantial constitutional deprivation. Well, because the evidence that was adduced in the post-conviction proceedings shows that this would have been extremely helpful to the defense, both to challenge Dr. Traugott's credibility and as a freestanding claim of affecting the insanity defense. But the test isn't whether it's helpful. The test is whether it was withheld. There was testimony at the post-conviction proceedings from trial counsel for the defense that Dr. Traugott had not been court-appointed. Dr. Traugott had been retained by the State. So he's an agent of the State. He's in possession of relevant evidence, and for whatever reason, whether he doesn't think it's important, I don't think he did anything unethical. He just thought it wasn't important. But that's not for him to decide, because it is relevant to the circumstances of the crime, to the circumstances of the defense. And that's an issue that Mr. Szilagyi has yet to be heard on. And I would ask this Court to give him that opportunity. And I thank you for your time. Thank you. I take the matter under advisement.